UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| CITY OF AURORA, INDIANA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:23-cv-00017-TWP-KMB |
| ) | |
| NATIONAL FIRE & CASUALTY COMPANY, ) | |
| ) | |
| Defendant. ) | |

### ORDER ON DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND PLAINTIFF'S MOTION FOR LEAVE TO FILE SURREPLY

This matter is before the Court on a Motion for Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) by Defendant National Fire & Casualty Company ("NFCC") (Filing No. 26), and a Motion for Leave to File Surreply filed by Plaintiff City of Aurora, Indiana ("Aurora") (Filing No. 33). Aurora initiated this action against NFCC for its breach of insurance contract and bad faith, alleging that NFCC failed to pay for covered losses (Filing No. 1-2). NFCC answered the Complaint (Filing No. 3) and then moved for judgment on the pleadings (Filing No. 26). Aurora seeks leave to file a surreply brief opposing judgment on the pleadings (Filing No. 33). For the following reasons, NFCC's Motion for Judgment on the Pleadings is **denied in part and granted in part.** Aurora's Motion for Leave to File Surreply is **denied**.

### I.   BACKGROUND

The following facts are not necessarily objectively true, but as required when reviewing a motion for judgment on the pleadings, the Court accepts as true the factual allegations in the Complaint and draws all inferences in favor of Aurora as the non-moving party. *See Emergency Servs. Billing Corp. v. Allstate Ins. Co.*, 668 F.3d 459, 464 (7th Cir. 2012).

Aurora is city located in southern Indiana (Filing No. 1-2 at 2). Aurora purchased an insurance policy ("the Policy") from NFCC insuring it for certain crimes, including some computer crimes. *Id*. The policy insured a "Computer and Funds Transfer Fraud" with a limit of $100,000.00 per occurrence and a deductible of $250.00. Relevant to this dispute, the "Computer and Funds Transfer Fraud" section provides:

> **7. Computer and Funds Transfer Fraud**
> a. We will pay for:
>> (1) Loss resulting directly from a fraudulent:
>>> (a) Entry of "electronic data" or "computer program" into; or
>>> (b) change of electronic data" or "computer program" within;
>>> any "computer system" owned, leased or operated by you, provided the fraudulent change causes, with regard to Paragraphs 7.a.(1)(a) and 7.a.(1)(b):
>>>> (i) "Money," "securities," or "other property" to be transferred, paid or delivered; or
>>>> (ii) Your account at a "financial institution" to be debited or deleted.
>> (2) Loss resulting directly from a "fraudulent instruction" directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that account.
> b. As used in Paragraph 7.a.(1), fraudulent entry or fraudulent change of "electronic data" or "computer program" shall include such entry or change made by an "employee" acting in good faith, upon a "fraudulent instruction" received from a computer software contractor who has a written agreement with you to design, implement or service "computer programs" for a "computer system" covered under this Insuring Agreement

(Filing No. 1-2 at 13).

The Policy, under the "crime coverage," also included a series of definitions. Definitions relevant to this dispute include:

> 10. "Forgery" means the signing of the name of another person or organization with the intent to deceive; it does not mean a signature which consists in whole or in part of one's own name signed with or without authority, in any capacity, for any purpose.
> 11. "Fraudulent instruction" means:
>> a. With regard to Insuring Agreement **A.7.a.(2)**:
>>> (1) A computer, telefacsimile, telephone or other electronic instruction directing a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from the "transfer

> account", which instruction purports to have been issued by you, but which in fact was fraudulently issued by someone else without your knowledge or consent; or
>
> (2) A written instruction (other than those covered under Insuring Agreement A.3.) issued to a "financial institution" to debit your "transfer account" and to transfer, pay or deliver "money" or "securities" from that "transfer account", through an electronic funds transfer system at specified times or under specified times or under specified conditions, which instruction purports to have been issued by you, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

(Filing No. 1-2 at 24).

In February 2022, Aurora retained a contractor to perform restoration work on the city's pool. Throughout the restoration process, Aurora's Clerk-Treasurer, Benjamin L. Turner ("Clerk-Treasurer"), communicated with the contractor through email, including discussions of costs and Aurora's payment (Filing No. 1-2 at 2).

At one point during the coverage period for the Policy, a third-party ("the Imposter") began following an email conversation between the pool contractor and the Clerk-Treasurer. *Id.* The Imposter impersonated the pool contractor by using an email address that closely resembled the pool contractor's email. *Id.* The Clerk-Treasurer did not notice the change in email addresses. *Id.* The Imposter asked for the next partial payment for the pool restoration work by Automatic Clearing House ("ACH") although Aurora usually paid via paper checks. *Id.* The Imposter provided a bank account and routing number to the Clerk-Treasurer. *Id.* Because the Imposter explained that the company was trying to eliminate paper checks, Aurora was not suspicious of the change in payment type. *Id.* Eventually, Aurora's Clerk-Treasurer sent an ACH of $233,585.04 to the Imposter. *Id.*

Once Aurora learned that its Clerk-Treasurer had been duped, it contacted its bank to try to recover the funds sent to the Imposter by the Clerk-Treasurer. The bank denied Aurora's request. (Filing No. 1-2 at 3.)

On August 1, 2022, Aurora submitted a detailed statement to NFCC describing the facts surrounding the incident to recover under the Policy's "Computer and Funds Transfer Fraud" section. *Id*. On August 10, 2022, NFCC's president sent an email denying Aurora's claim and explaining that its claim falls outside the enumerated types of losses provided for in the Policy. *Id*. Thereafter, Aurora submitted a formal Sworn Statement of Proof of Loss making a claim under the Policy for $99,750.000, which is the maximum amount available with the deductible subtracted. *Id*.

On January 3, 2023, Aurora initiated this action by filing its Complaint against NFCC in Dearborn Circuit Court alleging two counts: (1) NFCC breached its insurance contract with Aurora, and (2) NFCC acted in bad faith when it denied Aurora's claim ([Filing No. 1-2](#)). After NFCC filed its Motion for Judgment on the Pleadings on both claims ([Filing No. 26](#)), Aurora filed a Response ([Filing No. 29](#)), and NFCC filed a Reply ([Filing No. 30](#)). Aurora then filed its Motion for Leave to File Surreply ([Filing No. 33-1](#)).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the parties have filed a complaint and an answer, and the pleadings are closed. Rule 12(c) motions are analyzed under the same standard as Rule 12(b)(6) motions to dismiss.[1] *Pisciotta v. Old Nat'l Bancorp.*, 499 F.3d 629, 633 (7th Cir. 2007); *Frey v. Bank One*, 91 F.3d 45, 46 (7th Cir. 1996). The complaint must allege facts that are "enough to raise a right to relief above the speculative

---

[1] The parties dispute the appropriate legal standard for a 12(c) motion for judgment on the pleadings. However, analysis under the same standard as a 12(b)(6) motion to dismiss is well-established in this Court. *Pisciotta*, 499 F.3d at 633. The case relied upon by NFCC confirms that "[w]e take all well-pleaded allegations in the plaintiffs' pleadings to be true, and we view the facts and inferences to be drawn from those allegations in the light most favorable to the plaintiffs." *Alexander v. Aurora of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). Because there is no dispute in facts, this Court sees no material difference.

level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Id.* Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (internal citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Like a Rule 12(b)(6) motion, the court will grant a Rule 12(c) motion only if "it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *N. Ind. Gun & Outdoor Shows, Inc. v. Aurora of S. Bend*, 163 F.3d 449, 452 (7th Cir. 1998) (quoting *Craigs, Inc. v. Gen. Elec. Capital Corp.*, 12 F.3d 686, 688 (7th Cir. 1993)). The factual allegations in the complaint are viewed in a light most favorable to the non-moving party; however, the court is "not obliged to ignore any facts set forth in the complaint that undermine the plaintiff's claim or to assign any weight to unsupported conclusions of law." *Id.* (quoting *R.J.R. Serv., Inc. v. Aetna Cas. & Sur. Co.*, 895 F.2d 279, 281 (7th Cir. 1989)). "As the title of the rule implies, Rule 12(c) permits a judgment based on the pleadings alone. . . . The pleadings include the complaint, the answer, and any written instruments attached as exhibits." *Id.* (internal citations omitted).

### III.   DISCUSSION

NFCC asks the Court to enter judgment on the pleadings in its favor on both claims asserted by Aurora: Count I:  NFCC breached its insurance contract and Count II: NFCC acted in bad faith when it denied Aurora's claim. After NFCC filed its reply brief, Aurora filed a Motion for Leave

5

to File Surreply.  The Court will first address the request for leave to file a surreply and then turn to the request for judgment on the pleadings.

A.      **Motion for Leave to File Surreply**

On March 19, 2023, NFCC filed a Motion for Judgment on the Pleadings (Filing No. 26). Two weeks later, on June 2, 2023, Aurora responded to the Motion. (Filing No. 29,)  One week later, NFCC filed its reply brief.  (Filing No. 30.)  Aurora then filed a Motion for Leave to File Surreply, arguing that NFCC advanced new arguments.  (Filing No. 33.)

> The purpose for having a motion, response and reply is to give the movant the final opportunity to be heard and to rebut the non-movant's response, thereby persuading the court that the movant is entitled to the relief requested by the motion. New arguments and evidence may not be raised for the first time in a reply brief. Reply briefs are for replying, not raising new arguments or arguments that could have been advanced in the opening brief. Courts allow a surreply brief only in limited circumstances to address new arguments or evidence raised in the reply brief or objections to the admissibility of the evidence cited in the response.

*Lawrenceburg Power, LLC v. Lawrenceburg Mun. Utils.*, 410 F. Supp. 3d 943, 949 (S.D. Ind. 2019) (internal citations and quotation marks omitted).

Aurora seeks leave to file a document attached to its Motion entitled Plaintiff's Surreply Regarding Defendant's Motion for Judgment on the Pleadings (Filing No. 33-1).  Aurora asserts that in its reply brief, NFCC raised a new issue and "NFCC now argues that its policy language requires the fraudulent entry or fraudulent change of data to "directly cause" the loss. Although the new argument in reply references the same policy language quoted in NFCC's opening brief, the opening brief contained no cogent argument about "direct" causation, and Plaintiff has not had an opportunity or reason to respond to such an argument. (Filing No. 33 at 1).  Aurora contends that "[i]n its Reply, NFCC argues for the first time that the computer data itself must "directly" cause the transfer of funds itself must directly cause the transfer of funds." (Filing No. 33-1 at 4) (emphasis omitted) (internal quotations omitted).)

In response to Aurora's Motion, NFCC highlights relevant portions of the Policy's "Computer And Funds Transfer" section that state "[l]oss resulting directly from. . ." (Filing No. 34 at 2-3) (emphasis omitted). NFCC also asserts that Aurora merely reiterates case law relied on in Aurora's response brief and Aurora's proposed surreply does not respond to new arguments or issues raised in NFFC's reply brief, and there is no basis to allow a surreply.

Upon review of the parties' briefing and surreply briefing, the Court agrees that NFCC's reply brief did not inject new arguments or issues into the judgment on the pleadings briefing. A review of the parties' opening, response, and reply briefs reveals that NFCC's reply brief arguments were appropriate rebuttals to Aurora's response brief arguments—NFCC attempts to apply the analysis from a case heavily relied on in Aurora's response to distinguish the present facts. NFCC therefore did not raise new arguments or issues in the reply brief. Considering the limited purposes of a surreply brief and the limited circumstances under which they are permitted (which do not exist here), Aurora's Motion for Leave to File Surreply (Filing No. 33) is **denied** as its surreply brief impermissibly attempts to usurp from the movant the final opportunity to be heard.

B.      **Motion for Judgment on the Pleadings**

The Court will first address judgment on the pleadings of the breach of insurance contract claim and then turn to the bad faith claim.

1.      **Insurance Coverage Claim**

NFCC argues that it is entitled to judgment on the pleadings because Aurora's claim falls outside the enumerated types of losses provided in the Policy. NFCC asserts that Aurora's loss resulted directly from the Clerk-Treasurer's error, which is not a specified type of loss in either "Computer And Funds Transfer Fraud" subsection.

7

First, NFCC argues that the Imposter's actions are not covered under the first subsection of the "Computer And Frauds Transfer Fraud" section (Section (7.a.(1)) because the Imposter neither downloaded nor changed data on Aurora's computer or in Aurora's computer system. In sum, NFCC argues that there was no "fraudulent entry" or "fraudulent change" by the Imposter that resulted in the loss (File No. 27 at 10). Rather, the Clerk-Treasurer followed the Imposter's instructions and erroneously paid the Imposter, which is outside the scope of coverage provided under 7.a(1)(A) or 7.a.(1)(B).

Likewise, NFCC argues that subsection two (7.a.(2)) does not apply because Aurora's loss did not result from the Imposter giving a "fraudulent instruction" to Aurora's bank. NFCC argues that the Policy's definition of "fraudulent instruction" set forth in sections 11.a.(1) and 11.a.(2) only "contemplates the scenario where someone impersonating an insured directs the insured's bank to withdraw or pay funds from the insured's account." *Id.* at 11. Aurora alleges that the Imposter impersonated the real pool contractor, not Aurora. The Imposter did not direct Aurora's bank while impersonating Aurora. Accordingly, NFCC contends it is entitled to judgment on the pleadings because neither subsection of the "Computer And Frauds Transfer Fraud" portion of the Policy covers Aurora's claim.

As to NFCC's "fraudulent entry" argument, Aurora responds that the Policy's plain language supports coverage because there is no explicit language that a "fraudulent entry" or "fraudulent change" must be conducted by "an outsider or nefarious perpetrator" (Filing No. 29 at 5). Rather, under subsection 7.a(1), any fraudulent entry of data is covered if the loss results from that entry. Aurora thus argues that the Imposter's emails were a "fraudulent entry" because the Imposter "implanted" "a series of forged emails" into Aurora's email server. *Id.* at 5-6. Thereafter, the Clerk-Treasurer used an Aurora computer to issue a "fraudulent instruction" directing Aurora's

8

bank to pay an account Aurora believed to be the pool contractor's account.  Aurora contends that the fact that the Clerk-Treasurer "keyed" the instruction does not make it less fraudulent, as Aurora received the instruction "by trick."  *Id.* at 6; *see McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000); *G&G Oil Co. v. Continental W. Ins.*, 165 N.E.3d 82, 89 (Ind. 2021) (reversing summary judgment for an insurance company stating that the policy's term "fraudulently cause a transfer" can be reasonably understood as "obtain by trick").

As to NFFC's "fraudulent instruction" argument, Aurora responds that the Clerk-Treasurer's instruction to the bank falls within the definition of "fraudulent instruction" because the Policy only requires that the instruction is "issued, forged or altered by someone else without [Aurora's] knowledge or consent."  (Filing No. 29 at 14 (emphasis omitted).)  Aurora argues that each of the Imposter's emails to Aurora was a "forgery," as defined under the Policy because each email contained the name of another person with the intent to deceive (*Id.*; Filing No. 1-2 at 24).  One forged email contained an instruction issued to Aurora's bank, which appeared to be Aurora's instruction but, in fact, was a forged instruction by the Imposter without Aurora's knowledge or consent.  Aurora supports this conclusion by citing a United States District Court for the Southern District of Texas case.  *See Valero Title Inc v. RLI Ins.*, No. 4:19-CV-443, 2021 WL 5154790, at *3 (S.D. Tex. 2021)*, aff'd sub nom. Valero Title Inc. v. RLI Ins.*, No. 22-20155, 2023 WL 1434270 (5th Cir. Feb. 1, 2023) (denying summary judgment because a fraudster deceived an insured regarding where to transfer funds by "signing the name of another person or organization," which is covered under the insurance policy's "loss of funds resulting directly from a fraudulent instruction" clause).

In reply, NFCC reasserts that the Clerk-Treasurer's negligence, not the Imposter's emails, caused Aurora's loss.  As to "fraudulent entry" or "fraudulent change," NFCC contends the Policy

requires that the entry "must directly and proximately cause" the insured's loss (Filing No. 30 at 6). The Clerk-Treasurer's independent actions resulted in the loss, and "the Policy does not afford coverage for a loss where the insured's use of the computer was merely incidental". *Id.* Furthermore, in a footnote, NFCC argues that Aurora's Complaint does not mention any change to Aurora's data or email system. Although NFCC concedes that the Clerk-Treasurer was a victim of fraud, NFCC argues that it is not the type of fraud afforded under the Policy.

NFCC also distinguishes the Imposter's actions from the hacker in *G&G Oil*, which Aurora heavily relied on. *G&G Oil Co.*, 165 N.E.3d at 82. There, the hacker downloaded software into the insured's computer system rendering the computer system inoperable; here, the Clerk-Treasurer received emails that did not download software. *Id.* at 85. Second, NFCC argues that when applying the Court's proximate cause analysis in *G&G Oil*, the Clerk-Treasurer's actions—contacting the bank and setting up an ACH account—after receiving the emails severed any causal relationship between Aurora's loss and the Clerk-Treasurer's computer. *See id.* at 90 (requiring the loss to be "immediately or proximately without significant deviation from the use of a computer" to be covered under the insurance policy clause "resulting directly from the use of a computer").

As to Aurora's argument of the "forged" emails providing instruction to Aurora's bank, NFCC argues that the Policy's definition of "fraudulent instruction" limits coverage to "circumstances where an individual impersonating an insured communicates directly with the insured's bank to withdraw or pay funds from the insured's account." (Filing No. 30 at 11.) Because Aurora did not allege that the Imposter directly contacted Aurora's bank while impersonating Aurora, the Imposter's emails do not qualify as a "fraudulent instruction" to afford coverage under the Policy. NFCC argues it is entitled to judgment on the pleadings because the

"Computer and Funds Transfer" section of the Policy does not cover the Imposter's or the Clerk-Treasurer's actions.

Taking the allegations in the Complaint as true at this stage of the litigation, the Court concludes that Aurora sufficiently alleges facts to infer that the Imposter's emails were a "fraudulent entry" on Aurora's computer or a "fraudulent instruction" directed to Aurora's bank.

In a recent and distinguishable decision, the Indiana Supreme Court construed "fraudulently cause a transfer" in a crime coverage insurance policy to mean a transfer "obtain[ed] by trick." *G&G Oil Co.*, 165 N.E.3d at 89; *see McClellan*, 217 F.3d at 893 ("No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."). Additionally, the Indiana Supreme Court determined that "directly from the use of a computer" may include a "voluntary transfer" if the loss resulted "immediately or proximately without deviation from the use of a computer." *G&G Oil Co.*, 165 N.E.3d at 90. This Court's interpretation of insurance contracts is governed by Indiana law. The Court therefore declines to strictly construe either subsection of the "Computer And Funds Transfer Fraud" section against Aurora.

"[C]ourts grant a Rule 12(c) motion only if it appears beyond doubt that the plaintiff cannot prove any facts that would support his claim for relief." *N. Ind. Gun & Outdoor Shows*, 163 F.3d at 452. Such is not the case here; therefore, judgment on the pleadings on Count I is unwarranted. The Court **denies** judgement on the pleadings as to the insurance coverage claim.

2. **Bad Faith Claim**

Next, the NFCC asks the Court to enter judgment on the pleadings on Aurora's bad faith claim. Implied in all insurance contracts in Indiana is the duty of an insurer to deal with its insured in good faith. *Erie Ins. Co. v. Hickman,* 622 N.E.2d 515, 518 (Ind. 1993). A claim

11

of bad faith exists when the insurer breaches the duty to deal in good faith by denying a claim when it knows that there is no rational, principled basis for doing so. *Freidline v. Shelby Ins. Co.,* 774 N.E.2d 37, 40 (Ind. 2002). However, "(t)he insurer does not necessarily breach its duty of good faith every time it erroneously denies an insurance claim." *Nelson v. Jimison,* 634 N.E.2d 509, 512 (Ind. 1994). A finding of bad faith requires evidence of a state of mind of "conscious wrongdoing" including "dishonest purpose, moral obliquity, furtive design, or ill will." *See Monroe Guar. Ins. Co. v. Magwerks Corp.,* 829 N.E.2d 968, 977 (Ind. 2005) (internal quotation omitted); *Colley v. Ind. Farmers Mut. Ins. Group,* 691 N.E.2d 1259, 1261 (Ind. Ct. 1998) ("Poor judgment or negligence do not amount to bad faith; the additional element of conscious wrongdoing must also be present.").

NFCC argues that Aurora's claim of bad faith is baseless because Aurora did not allege facts that demonstrate "conscious wrongdoing." Rather, NFCC contends that its response within one week that provided a "well-reasoned" explanation of the denial based on specific policy terms is "exemplary conduct" "in the insurance world" (Filing No. 27 at 13-14). Therefore, NFCC argues that judgment on the pleadings is appropriate.

In response, Aurora argues that NFCC's motion for judgment on the pleadings should be denied because the duty to deal in good faith ". . .includes an obligation to refrain from causing an unfounded delay in making a payment" and "making an unfounded refusal to pay the policy proceeds" (Filing No. 29 at 18) (*see Worth v. Tamarack American, a Div. Of Great American Ins. Co.,* 47 F.Supp.2d 1087, 1100 (S.D. Ind. 1999)). Aurora further argues that the requisite state of mind needed to support a claim of bad faith can be inferred when insurance provisions are clear, which Aurora claims here. *Id.* at 19.

In its reply, NFCC argues the bad faith claim lacks basis because Aurora relies solely on the fact that NFCC denied the claim. Aurora does not present evidence that NFCC denied the claim without a rational or principled basis, and there is no evidence that NFCC acted with a dishonest state of mind. Even so, NFCC argues that an insurance company's incorrect interpretation of the law is not evidence of bad faith. As a result, NFCC contends it is entitled to judgment on the pleadings.

Aurora has presented the Court with a copy of the emailed letter from NFCC denying coverage and its analysis for doing so (Filing No. 1-2 at 31-34). While this letter is evidence of denial, it is not evidence that NFCC lacked a reasonable basis for denying the claim. The letter demonstrates NFCC denied the claim based on its understanding of the Policy and interpretation of the stated definitions. Because NFCC promptly denied payment while providing an explanation for its decision, the allegations brought forth by Aurora are insufficient to support a claim of bad faith. *See Eli Lilly & Co. v. Zurich Am. Ins. Co.*, 405 F. Supp. 2d 948, 958 (S.D. Ind. 2005) (holding no unfounded or unreasonable delay exists when an insurance company refuses to pay out an insurance claim based on a mistaken belief that such claim is excluded under the terms of the contract).

The Complaint does not allege sufficient facts to demonstrate NFCC denied the claim in bad faith. The factual allegations listed in the Complaint and Policy provisions support an insurance claim, but those factual allegations do not support or create an independent claim for bad faith. Aurora alleges insufficient facts for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. Therefore, the judgment on the pleading is granted as to the bad faith claim.

### IV.  CONCLUSION

For the reasons explained above, Aurora's Motion for Leave to File Surreply (Filing No. 33) is **DENIED**.  NFCC's Motion for Judgment on the Pleadings (Filing No. 26) is **DENIED in part and GRANTED in part**.  Judgment on the pleadings is granted as to bad faith claim and that claim is **dismissed**.  This action may proceed on Aurora's breach of contract claim.

**SO ORDERED.**

Date:   11/21/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Frank G. Kramer
EWBANK & KRAMER
contact@ewbankkramer.com

Michael L. Schultz
PARR RICHEY FRANDSEN PATTERSON
  KRUSE LLP
mschultz@parrlaw.com

James A. L. Buddenbaum
PARR RICHEY FRANDSEN PATTERSON
  KRUSE LLP
jbuddenbaum@parrlaw.com

Philip K. Beth
HINKHOUSE WILLIAMS WASLH LLP
pbeth@hww-law.com

Caroline Kim
HINKHOUSE WILLIAMS WASLH LLP
ckim@hww-law.com

Richard A. Hodyl, Jr.
HINKHOUSE WILLIAMS WASLH LLP
rhodyl@hww-law.com